IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DIGENE CORPORATION,

                                                    OPINION AND ORDER

              Plaintiff,

                                                    3:07-cv-00022-bbc

      v.

THIRD WAVE TECHNOLOGIES, INC.,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In response to plaintiff Digene Corporation's complaint suing defendant Third Wave Technologies, Inc. for infringement of one of plaintiff's patents, defendant filed an answer and nine counterclaims, in four of which it alleged that plaintiff had violated various provisions of the Sherman Act and the Robinson-Patman Act. (Of the remaining five, four related to plaintiff's infringement charges, which have been dismissed, and one alleged that this is an exceptional case under 35 U.S.C. § 285, for which attorney fees should be awarded to defendant. I leave this last issue for another day, as explained below.)

In its amended antitrust counterclaims, defendant asserted that plaintiff had both monopolized and attempted to monopolize the market for human papilloma virus (HPV) testing in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. According to defendant,

plaintiff's monopolizing acts consisted of selling its HPV test kits through exclusionary contracts imposing onerous termination fees, by either giving away equipment or renting it at low prices, making false statements about defendant's analyte specific reagents (ASRs) and engaging in sham litigation, as demonstrated by the bringing of this allegedly baseless lawsuit for patent infringement.

In addition to its § 2 counterclaim, defendant asserted a violation of § 1 of the Sherman Act based on plaintiff's alleged monopolization of the market for its HPV test kits, again by using its market power to exclude competition.  Finally, defendant contended that plaintiff violated the Robinson-Patman Act by using free or low-cost gifts of equipment, cash payments for marketing and differential pricing of products in an effort to hinder competition.

I conclude that defendant has failed to show any violations of the Sherman Act or the Robinson-Patman Act.  Plaintiff has had a natural, but short-lived dominant position in the market for high risk HPV testing because it was the first to market a test for this purpose and the first (and still the only company) to secure FDA approval, not because it has engaged in acts prohibited by law.  Despite defendant's lack of FDA approval for its own test, defendant has proved to be a competitor in the HPV testing market, with a gradually increasing share of that market and the clear prospect of obtaining a greater share once it secures FDA approval.  It has been able to compete for many of the same customers that had

2

been using plaintiff's test kits and it has no evidence that its failure to win more contracts is attributable to any illegal acts by plaintiff rather than to the customer's choice to purchase plaintiff's FDA-approved test.  Therefore, plaintiff's motion for summary judgment on defendant's antitrust counterclaims will be granted.

From the facts proposed by the parties, I find that the following are material and undisputed.  (The process of finding the undisputed facts would have been much easier if the parties had not proposed as "facts" their own or their opponent's assertions, e.g., "plaintiff asserts that defendant's multi-year contracts are compelling customers to enter into exclusive contractual relationships," and if they had eliminated redundant proposals and ultimate issues of fact, e.g., "contrary to defendant's allegations, there is no dispute that plaintiff's contracts are not exclusive."  Whether the contracts are exclusive is a decision that cannot be made until the underlying facts are determined.)


UNDISPUTED FACTS

Plaintiff Digene Corporation developed the first commercial test to detect high-risk types of the human papilloma virus (HPV) using genetic procedures.  In 2003, it succeeded in obtaining Federal Drug Administration approval for its test kits.  No other company has developed an HPV test that is approved by the FDA.

Defendant Third Wave Technologies, Inc. competes for sales against plaintiff, offering

HPV analyte specific reagents (ASRs). The ASRs are raw materials and components that neither require nor have FDA approval but can be used by certain certified laboratories to create and validate their own diagnostic tests. Defendant has not obtained FDA approval for a test kit but is working toward that goal.

Since 2003, when plaintiff received FDA approval to market its HPV test kits for screening adjunctive to routine Pap testing for women over thirty, it has become increasingly common to combine HPV testing with routine Pap testing. Using both tests improves the effective diagnosis of cervical cancer to better than 99%.

Plaintiff's testing system is based on a technology platform known as Hybrid Capture 2, which can detect the presence of 12 HPV types. This in vitro diagnostic system includes the kit, which consists of the reagents and probes used to test for the presence of target DNA, and detection instruments. Plaintiff offers other equipment for automating the testing process, improving workflow and facilitating the process of large sample quantities (high-throughput). Plaintiff markets its testing kit to a variety of testing facilities, including commercial laboratories, such as Quest Diagnostics, Inc. and LabCorp, managed care organizations that perform their own clinical testing and private and public hospitals and clinics.

The equipment for running plaintiff's HPV test ranges in price from approximately $49,000 for a non-automated system to $199,000 for a fully automated system. Although

plaintiff does not force customers to buy its equipment, laboratories that want to run FDA-approved tests must acquire five specific pieces of equipment from plaintiff that must be utilized to meet the FDA requirements.  The customer could obtain the equipment from other companies but it would not be validated by the FDA.  The other equipment necessary to run the tests does not require such validation and is readily available from many suppliers.

As a general rule, plaintiff sells or rents its test kits to customers under long term contracts (usually at least three years).  Doing so enables plaintiff to predict its manufacturing needs and protect its investment in the intellectual property it expends in training its customers' technicians and co-marketing the HPV tests (plaintiff's clinical sales representatives work to increase HPV referrals for their customer laboratories, meeting with doctors and other health care professionals in the laboratory's service area).  Long term contracts offer customers renting equipment the opportunity to spread out the rental payments over an extended period of time.

At the outset of contract negotiations, plaintiff begins by determining its customers' anticipated test kit supply needs and helping them undertake long-term planning based on known costs.  (The kits contain dated material with a limited shelf life.)  Once plaintiff's representative has a sense of the volume of test kits a customer will be buying and for how long, it will offer the customer a price that takes those factors into account.

Under the typical rental agreements, plaintiff sets a per kit price that includes the cost

5

of the equipment rental and takes into account the depreciated cost of the equipment over time.   This practice of incorporating the cost of equipment into the monthly reagent fee is not unusual in the industry; most laboratories do not have the resources to purchase the equipment necessary to run molecular diagnostic tests.   Also included in the per kit price are the costs of the technical support and training for laboratory technicians that plaintiff provides, as well as the cost of co-marketing.

Plaintiff's contracts with it customers vary considerably.   Some allow termination for a number of reasons, including the availability of new technology.   Most, but not all, include provisions that require customers to pay fees or penalties upon termination.   These fees may include liquidated damages for the value of equipment, plus return of the equipment, or payment for the price of test kits that would have been purchased during the remaining term of the contract.   Generally, customers are free to terminate their contracts when they have purchased the minimum number of agreed-upon test kits.

Approximately 60.8% of plaintiff's test kit revenue comes from four customers whose contracts vary in duration.   Plaintiff's biggest customer is Quest Diagnostics Laboratories, Inc.   Its 2003 contract with Quest provided the laboratory "most favored customer" treatment in pricing, large discounts, termination on 90 days' notice (with Quest having to pay plaintiff the remaining balance of rent payments on all rental equipment), fixed prices unless changed by mutual consent, cash payments for co-marketing and the agreement that

6

Quest would purchase all its HPV testing kits from plaintiff.   Plaintiff's 2007 contract with Quest kept the most favored customer provision, extended the length of the contract to four years, provided that all equipment would be purchased by Quest and continued the cash payments for co-marketing.  The contract had no minimum purchase requirement.

Plaintiff's 2006 contract with AmeriPath had a three-year term, included price reductions for volume purchases and allowed the lab to use equipment owned by plaintiff at no charge.  The contract provided that the use of the equipment was provided in consideration of the lab's agreement to purchase the products specified in the contract.  The agreement contained no termination fee.

Plaintiff's 2000 contract with Kaiser Foundation Health Plan, Inc. allowed Kaiser to terminate the contract at any time after giving 90 days' written notice or within 30 days after receiving written notice of any increase in the price of products.  It included a most favored customer pricing provision and the same pricing for the three-year term of the contract.  Before entering into a second contract with plaintiff in 2003, Kaiser sought and obtained price reductions from plaintiff and kept the other provisions of the 2000 contract.  Its 2006 contract with plaintiff kept the most favored customer provision, allowed termination for default with no penalties or fees and provided for fixed prices subject to volume reductions.

Plaintiff's 2004 contract with Laboratory Corporation of America allowed LabCorp

to terminate the agreement upon 90 days' written notice, provided cash for co-marketing and placed certain equipment at the lab for no charge. An amendment agreed to in November 2005 extended the contract to April 2008, kept the same prices in effect and included additional equipment to be provided by plaintiff at no charge. Another amendment in August 2006 reaffirmed the pricing and the continued use of plaintiff's equipment at no charge and contained no termination fee or penalty.

Plaintiff has never enforced a contract termination clause against a customer since defendant has had its ASRs on the market. In that same period, no customer has ever asked to terminate a contract early or waive the termination fee so that it could change to another HPV test provider, although some customers may have asked to terminate their contracts and get out of the HPV testing business.

None of plaintiff's contracts prohibit its customers from buying ASRs from defendant. Plaintiff's contract with its largest customer, Quest, prohibits the laboratory from purchasing or promoting any products covered by any patents owned by plaintiff or licensed to it that are related to HPV, Hybrid Capture technology or plaintiff's tests for hepatitis B, cytomegalovirus, chlamydia or gonorrhea, unless plaintiff has licensed the patents to Quest.

One of plaintiff's goals was to "lockout competition from gaining traction and block other competitors from gaining market share." Robertson Decl., dkt. #150, exh. #89 at 0242125. Plaintiff's general market strategy has been to "create loyalty and barriers to

8

competitive market entry," id., exh. #88 at DC _0241408, and as of January 2007, its strategy was to insure that 80% of its business was "secured for 24 months plus." Id., exh. #89, at DC_ 0242030.

At various times, plaintiff's representatives told customers and potential customers that the FDA disfavored the use of ASRs, that defendant's ASR product did not comply with the guidelines of the American College of Obstetricians and Gynecologists and that the potential for false negatives in a pap test led to "missed cancer."

Plaintiff's HPV test is covered under most private insurance plans, as well as Medicare and Medicaid. Reimbursement is provided by the insurer directly to the laboratory performing the test.

Plaintiff's revenues from HPV products increased more than ten-fold from 1998 to 2006, but its test kit is more than ten years old. Plaintiff is concerned that the pace of its innovation is not keeping up with the rapid pace of technological changes in the market. It anticipates that if defendant or any other competitor obtains FDA approval for its HPV testing system, plaintiff's screening business will be threatened.

Like plaintiff, defendant is engaged in the research, development, manufacture and sale of molecular diagnostic products to clinical testing laboratories and other customers. Its products can be used to test for the same list of high-risk HPV types as plaintiff's system and one additional type.

9

Unlike plaintiff, defendant does not presently offer its testing product as part of a complete in vitro diagnostic system.  It sells its ASRs as a part of three separate "Oligo Mixes" under the umbrella of its Invader® product line.  Laboratories buying the mixes must assemble them into a laboratory-developed assay and validate the assays themselves for clinical diagnostic use. The ASRs are not easily used in high throughput operations.

Validation of the ASRs can involve testing a group of samples using both the analyte specific reagent system and plaintiff's test and then reconciling discrepancies.  Validation can also be done using a process known as polymerase chain reaction.

Without FDA approval for its ASRs, defendant cannot provide customers with information on the analytical or clinical performance of its HPV products or provide detailed instructions on the use of its ASRs.

Defendant began developing ASRs for HPV testing in earnest at least as early as the spring of 2004.  By late 2004, it had developed products and was preparing to launch them into the marketplace.  In November 2004, it presented data about the HPV ASR product at a meeting of the Association for Molecular Pathology.  Defendant contacted laboratories about its product design in early 2005, launched its HPV products to a select group of laboratories in approximately May 2005 and entered into its first customer contract in September 2005.

Initially, defendant concentrated its marketing efforts on laboratories with low to

10

mid-volume processing requirements.   When it drew up its 2005-06 business plan, it analyzed the 167 potential customers in its database and concluded that only 40 were target customers, that is, the ones most likely to purchase defendant's ASRs.  All of the 40 were low-volume to mid-volume existing facilities accustomed to using products that did not require FDA approval or a high throughput solution.  However, since then, defendant has made sales to customers with high-volume needs.  As of September 2007, defendant had made sales to approximately 25 customers, the two largest of which are Spectrum Laboratory Network and St. John's Regional Center.

Spectrum switched its contract to defendant because of pricing and because defendant's product met certain automation needs at its laboratory.  Defendant offered Spectrum a quantity discount and an opportunity to keep at no charge certain equipment that it had been using for cystic fibrosis testing that could be used for HPV testing as well. Defendant's contract with Spectrum is for three years and contains a clause that provides that in the event of a material breach by Spectrum, defendant may declare the entire balance of all unpaid amounts due and payable.  In addition, it includes a commitment to formalize a co-marketing arrangement and it requires Spectrum to purchase HPV ASRs exclusively from defendant, with one exception:  Spectrum may purchase assay kits from plaintiff to the extent necessary to meet its existing contractual obligations with plaintiff.

As of July 2007, 292 customers were under contract to plaintiff.  89.7%, or 262 of

11

these customers had entered into their contracts between January 1, 2005 (after defendant had announced its HPV ASR products) and July 1, 2007.  The thirty customers who contracted to buy test kits from plaintiff before January 1, 2005 accounted for 1.9% of the market total for 2006, with market total taking into account all tests sold in 2006 by all competitors.  Since January 1, 2005, the contracts of all of plaintiff's four largest customers have come up for renewal.

In October 2006, Quest Diagnostic Laboratories, Inc., plaintiff's largest customer, sent defendant a Request for Proposal, soliciting information on FDA clearance status. Approximately a year earlier, defendant had informed Quest of the timing of its anticipated FDA submission and offered to indemnify Quest for any liability it incurred from the use of non-FDA-approved ASRs.  Quest continued to express concern about defendant's  lack of FDA approval for its ASRs. In June 2007, it informed defendant that it had decided to continue use of plaintiff's product.

Until recently, defendant's contracts with its customers charged a price for its reagents that included the rental price for the equipment necessary to run the ASRs.  Now it shows the two costs as separate.  Defendant's contracts provide that upon termination for breach of contract or financial insolvency, the customer must immediately pay all amounts due and owing, including minimum purchase obligations.

Since 2006, defendant has subjected its testing process to clinical trials, which are a

12

prerequisite to FDA approval of an in vitro diagnostic system.  Such a system would give defendant more control over the assay performance and an opportunity to provide direct instructions for the use of the assay so that it has more consistency of ultimate results.  The lack of FDA approval means that defendant cannot sell its ASRs to the numerous laboratories and hospitals whose policies or physician preferences require use of FDA-approved products for diagnosing cervical cancer.

Defendant's marketing plans for its ASRs list the following as the key barriers to entry: [lack of] FDA approval and high throughput sample processing capabilities; [the need for] key opinion leader endorsement and sufficient reimbursement from insurers; intellectual property; and commercialization expense.  In April 2006, when Scott Campbell was defendant's director of marketing, he believed that FDA approval was one of the highest barriers to entry for defendant because of the many laboratories and hospitals with policies requiring the use of an FDA-approved product for cervical cancer diagnostics.  He identified the difficulty of validating results of defendant's ASRs as another concern raised by potential customers.

Among other handicaps imposed by the lack of FDA approval, the FDA regulates the statements that providers of ASRs and providers of FDA-approved products may make about their products.  It prohibits ASR providers from making any statements about the analytical or clinical performance of their products.

13

Campbell, defendant's director of marketing, had concerns about potential risks in entering the market, given the number of suits that arose out of the Pap technology.  He was aware that some laboratories had doubts about validating and selling a set of reagents that were different from plaintiff's test, fearing the problem of false negatives.

Campbell saw plaintiff as having a "First-Mover Advantage" because it was the first to market an in vitro diagnostic system for HPV testing.  He believed that plaintiff had achieved success through a successful combination of regulatory, marketing and collaborative efforts that won the company unparalleled brand awareness in the lab market and in many papers.

## OPINION

A. Defendant's Sixth Counterclaim: Sherman Act § 2 Monopolization

Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it a crime to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States."  A plaintiff alleging actual or attempted monopolization "must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power."  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455 (1993).  "[W]ithout a definition of that market there is no way to measure the [alleged monopolist's] ability to lessen or destroy competition."  Id. at 456 (quoting Walker Process

14

Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177 (1965)).

Solely for the purpose of this motion, plaintiff does not contest defendant's definition of the market or defendant's assertion that plaintiff has monopoly power in that market, as shown by its having more than 95% of the sales in the "relevant market." The first market, which defendant calls the Product Market, consists of DNA reagents or detection systems for the detection of HPV marketed or sold in the United States for use by molecular diagnostics laboratories for the screening, monitoring and diagnosis of women's infectious diseases and cancer. A second market, the Technology Market, consists of both the technology claimed in plaintiff's '715 patent and any competitive alternative technologies that enable laboratories in the field of molecular diagnostics to design or operate testing platforms for use with HPV reagents or detection systems that are sold in the United States. The HPV Equipment Market includes the equipment used to detect HPV by methods developed in the Technology Market. With respect to all three markets, the geographic market is the United States or, alternatively, the world.

Section 2 does not make plaintiff's monopoly power actionable unless it is exercised in a manner that is objectively anticompetitive. Verizon Communications Inc. v. Law Offices of Curtis V. Trinko. LLP, 540 U.S. 398, 407 (2004). "Not the possession, but the abuse, of monopoly power violates section 2 [of the Sherman Act]." Olympia Equip;ment Leasing Co. v. Western Union Telegraph Co., 797 F.2d 370, 374 (7th Cir. 1986). Defendant alleges

15

anticompetiveness consisting of exclusive dealing arrangements, false statements about defendant and objectively baseless and sham litigation pursued in this court.

Starting with defendant's first allegation, it is undisputed that none of plaintiff's contracts with its customers were exclusive.  Defendant has produced no contract in which plaintiff prohibited its customers from buying tests from defendant.  (Defendant argues that the paragraph in the 2007 Quest contract had this effect because it prohibited Quest from buying any product that would infringe on any of plaintiff's patents, but defendant does not suggest that its ASRs infringed any of defendant's patents.)

Defendant's real argument is that plaintiff's contracts were "exclusionary" because they "locked in" customers for long periods of time and had the effect of foreclosing the relevant market to competitors.  The argument might be more persuasive were it not for the fact that the vast majority of plaintiff's contracts were entered into after November 2004, when defendant had disclosed to the public the news of its own test for the more dangerous types of HPV at the Association for Molecular Pathology.  Of these, most were signed after defendant had begun contacting laboratories in early 2005 and launched its products to a select group of businesses in the spring of 2005.  For the greater part of 2005, therefore, defendant was a presence in the nascent HPV testing field.  During this time period, defendant had as much contracting power as it does today.  It may not have had the sales

16

force, contacts or track record it does now (or that plaintiff possessed at the time), but it was a competitive factor in the market. Defendant has succeeded in winning over 25 customers that prefer its testing method to plaintiff's.  It had a chance to win the business of plaintiff's single biggest customer, Quest, but failed because of the apparent importance that Quest placed upon FDA test approval.

Defendant would like to characterize plaintiff's contracts as an illegitimate barrier to entry into the market for HPV testing products.  Undoubtedly, it is for that purpose that it quotes statements by plaintiff's employees about locking out the competition and blocking other competitors from gaining market share, but the statements do not demonstrate anticompetitive behavior.  Rather, they are of the sort that are to be expected among competitors.  The fact is that the long term contracts and termination fees and penalties have a valid business justification.  They promote "efficiency" by insuring that both supplier and customer can rely on a definite supply of test kits, permitting customers to amortize their equipment rental costs and protecting plaintiff's upfront investment of intellectual property in their customers.  Cf. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985) ("If a firm has been 'attempting to exclude rivals on some ground *other than* efficiency,' it is fair to characterize its behavior as predatory.") (quoting Robert Bork, The Antitrust Paradox, 160(1978)) (emphasis added).

17

The terms of plaintiff's contracts with its four biggest customers do not reflect an anticompetitive exercise of monopoly power.  Instead, they seem to reflect a market in which a number of constraints on anticompetitive behavior exist.  Plaintiff has not been able to impose termination fees and minimum purchase commitments on its biggest customers and has been forced to offer them multi-year fixed price contracts.  It is evident that at least the four largest customers have enough market power of their own to extract substantial concessions from plaintiff.  Undoubtedly they are aided by the availability of substitutes for plaintiff's test kit, which include defendant's ASRs and "homebrews" used by some customers to perform their own HPV tests.  As defendant's own expert observed, "for larger customers that could give an entrant the requisite substantive market share, [defendant, Ventana and homebrew suppliers] already appear to place some pricing constraint on [plaintiff]."  Gans Exp. Rep., exh. #46 to Bagley Aff., dkt. #124.

Further constraints exist in the form of private insurance companies and Medicaid, which impose ceilings on reimbursement of medical tests.  No lab is going to agree to pay either plaintiff or defendant more for a test than it can charge the doctors and hospitals that are its customers;  those doctors and hospitals are not likely to agree to pay more for a test than they can receive in reimbursement.

In an effort to bolster its allegations of anticompetitive behavior, defendant cites

18

plaintiff's offers of free equipment, cash for marketing and direct marketing to doctors; false statements about defendant's products; and sham litigation as evidenced by the bringing of this lawsuit. The allegation of false statements can be disposed of quickly because defendant has adduced no admissible evidence of any false statements. All it has in the way of disparaging statements made by plaintiff's representatives are comments to the effect that defendant's ASRs were not FDA-approved and did not meet the guidelines of the American College of Obstetricians and Gynecologists. Neither of these statements is false. To the extent that plaintiff's representatives warned of the possibility of liability arising out of the use of defendant's ASRs in place of plaintiff's kit, such a warning would not be groundless. Defendant itself noted the possibility of potential risks from lawsuits and the concern that labs had for tests that had not been approved by the FDA.

As for the allegation of "sham litigation," defendant may have prevailed on the merits of plaintiff's claims of patent infringement, but that outcome does not suggest that the lawsuit was frivolous. The issues were not so simple or clearly one-sided as to support a finding that the case was a sham. To the contrary, it raised some difficult issues of both fact and law.

The remaining allegation is that plaintiff used the provision of free equipment illegally to secure customers for its test kits. Defendant contends that this conduct was not only

19

anticompetitive in and of itself but also in violation of the Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b).  Even if the Act applied to civil litigation, which the Court of Appeals for the Seventh Circuit has held it does not, <u>West Allis Memorial Hospital, Inc. v. Bowen</u>, 852 F.2d 251, 255 (7th Cir. 1988), it does not apply to discounts disclosed to the customer.  § 1320a-7b(b)(3).  Defendant points to no purportedly free equipment that plaintiff did not disclose in a contract.  Moreover, as defendant's own expert has concluded, the "free" equipment was not actually free because it was folded into the unit prices plaintiff charged for its test kits.

I conclude that defendant has failed to show illegal monopolization of the relevant market by plaintiff.  Plaintiff is entitled to summary judgment on this counterclaim.

### B. <u>Seventh Counterclaim: Sherman Act § 2 Attempted Monopolization</u>

To prove attempted monopolization under § 2 of the Sherman Act, defendant must show (1) specific intent by plaintiff to achieve monopoly power; (2) predatory or anticompetitive conduct directed to accomplishing an unlawful purpose; and (3) the dangerous probability that the attempt would be successful.  <u>Indiana Grocery, Inc. v. Super Valu Stores, Inc.</u>, 864 F.2d 1409, 1413 (7th Cir. 1989).  Defendant maintains that it has ample proof of predatory conduct.  Dft.'s Br. in Opp., dkt. #161, at 38, but for the most part, this "proof" boils down to assertions without evidence that genuine issues of material fact

20

exist about plaintiff's allegedly illegal conduct.

In the preceding section, I found that defendant could not prove actual monopolization because it was unable to show that plaintiff had exercised its market power anticompetitively, such as by foreclosing competitors from the relevant market. For the same reasons, I find that defendant has failed to show that plaintiff engaged in "predatory or anticompetitive conduct directed to accomplishing an unlawful purpose." Therefore, plaintiff's motion for summary judgment will be granted on this counterclaim.

## C. Eighth Counterclaim: Sherman Act, § 1 Restraint of Trade

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." Defendant maintains that plaintiff's contracts with its customers constitute an unreasonable restraint of trade in violation of the Act.

According to defendant, "[i]f exclusive dealing contracts significantly foreclose competition, they must be justified by procompetitive purposes which outweigh their anticompetitive effects." Dft.'s Opp. Br., dkt. #161, at 40 (citing Rome Ambulatory Surgical Center v. Rome Memorial Hospital, Inc., 349 F. Supp. 2d 389, 410-11 (N.D.N.Y. 2004)). The critical word is *if*. I have found that plaintiff's contracts (which even defendant admits

21

are not exclusive) do not significantly foreclose competition in the relevant markets. Defendant has been able to compete for sales since it first announced the development of its test. That it is has been hampered by the lack of FDA approval for the test is not the consequence of any anticompetitive act attributable to plaintiff. Accordingly, summary judgment will be granted to plaintiff on this counterclaim.

D. Ninth Counterclaim: Robinson-Patman Act

Section 13(a) of the Robinson-Patman, 15 U.S.C. § 13(a), prohibits price discrimination between different purchasers of commodities of like grade and quality where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. Defendant contends that plaintiff's provision of equipment at no charge brings it squarely within the provisions of this statute. It asserts that the purpose and effect of providing the free equipment was to block out competition, "thus forming a clear predatory pricing claim." Dft.'s Opp. Br., dkt. #161, at 43 (citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222-24 (1993)).

Defendant's argument omits the second half of a viable Robinson-Patman predatory

22

pricing claim, which is proof that the plaintiff had a dangerous probability of recouping its investment in below cost prices. Defendant has adduced no such proof. This is not surprising. Even assuming that references in the contract to providing equipment at no charge really meant that the equipment was free and not accounted for in the unit price of the test kits, defendant has not shown that letting customers use expensive equipment at no charge would create a situation in which plaintiff could enjoy a monopoly long enough to recoup its investment. The chances of plaintiff's continuing to enjoy a monopoly position in the relevant market is diminishing rapidly, as plaintiff's internal documents predict. Plaintiff's officers have expressed concern about the company's apparent inability to come up with additional innovative products and the significant competition defendant would offer if it obtained FDA approval for its tests. Defendant's share of the market is increasing and it is pursuing FDA approval.

It  defies logic to think that plaintiff would rent equipment at no charge and incur a loss for doing so when it was aware of the limited time it had in which it would to earn a return on its investment. All too soon, a competitor will obtain a patent on a more effective technique or another breakthrough will occur, making plaintiff's HPV test kits outmoded, unnecessary or more expensive than the competition.

In summary, plaintiff's situation appears to be that of an innovator, getting to market

first with a valuable product and thereby gaining the opportunity to make a substantial profit for so long as another innovator does not develop a more effective, lower priced or more reliable product. "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." Verizon Communications, 540 U.S. 407. "It is not enough that a single firm appears to 'restrain trade' unreasonably, for even a vigorous competitor may leave that impression. For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster." Goldwasser v. Ameritech Corp., 222 F.3d 390, 397 (7th Cir. 2000) (citing Copperweld Corp. v. Independence Tube Corp. 467 U.S. 752, 767-68 (1984)).

For now, plaintiff is selling a product that many customers prefer over the product defendant is selling, with the not surprising result that defendant has not captured as many customers as it wishes it had. But its resort to antitrust law is ill advised. The law does not regulate customer choice or require businesses to improve the lot of their competitors.

Because I have found that defendant has not sustained any of its antitrust counterclaims, it is not necessary to address plaintiff's assertion that defendant has failed to show any harm to itself or more important, to customers.


ORDER

IT IS ORDERED that plaintiff Digene Corporation's motion for summary judgment as to defendant's Third Wave Technologies, Inc.'s sixth, seventh, eighth and ninth counterclaims asserted in defendant's amended answer, dkt. #24, is GRANTED.

In light of this order, no trial will be necessary.  However, defendant may have until January 25, 2008, in which to either advise the court that it is withdrawing its fifth counterclaim or to submit a brief in support of the counterclaim.  If defendant files such a brief, plaintiff may have until February 8, 2008, in which to file a brief in opposition. Defendant may have until February 17, 2008, in which to file a reply.

Entered this 11th day of January, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

25

26